This Opinion is a
Precedent of the TTAB

Mailed: August 15, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*State Permits, Inc.*
*v.*
*Fieldvine, Inc.*

———

Cancellation No. 92075095

———

Kieran A. Lasater of Sparkman + Foote, LLC, and Alexandra Summers of Sausser Summers, PC,
    for State Permits, Inc.

Roberto Ledesma of Lewis & Lin, LLC,
    for Fieldvine, Inc.

—————

Before Zervas, Kuhlke and Wellington, Administrative Trademark Judges.

Opinion by Wellington, Administrative Trademark Judge:

Fieldvine, Inc. ("Respondent") owns a registration on the Supplemental Register for the term PERMITS.COM in standard characters for the following International Class 42 services:

> Software as a service (SAAS) services featuring software for digitizing paper forms and digital submissions for code compliant approvals and for providing information on code compliance, namely, code research,

municipal planning requirements and zoning ordinances in the field of construction.[1]

State Permits, Inc. ("Petitioner") seeks to cancel Respondent's registration, claiming prior use of, and a likelihood of confusion with, its alleged marks PERMIT.COM and ⊙ PERMIT.COM under Section 2(d) of the Trademark Act ("the Act"), 15 U.S.C. § 1052(d).

Petitioner claims ownership of applications to register its pleaded marks in connection with services described in both applications as "obtaining entitlements, namely, government and regulatory permits, licenses and approvals, to build subdivisions, residential and/or commercial structures for others," in International Class 45.[2] Petitioner seeks registrations for both marks on the Principal Register based on a claim in each application of acquired distinctiveness, in the entirety or in part, as to the term PERMIT.COM, under Section 2(f) of the Act, 15 U.S.C. § 1052(f).

Petitioner alleges "[a]t all times relevant herein, Petitioner was continuously using the PERMIT.COM Mark in United States commerce since at least as early as

---

[1] Registration No. 5992884 issued on February 18, 2020, and claims first use and first use in commerce on January 1, 2019.

[2] 12 TTABVUE 2 (Amended Petition to Cancel ¶ 1); Application Ser. Nos. 90106888 (word mark) and 90106895 (word and design mark), both filed on August 11, 2020, after Respondent's registration registered.

Citations to the record or briefs in this decision are to the publicly available documents on the Trademark Trial and Appeal Board Inquiry System (TTABVUE), the Board's electronic docketing system. The number preceding "TTABVUE" corresponds to the docket entry number; number(s) following "TTABVUE" refer to the page number(s) of that particular docket entry, if applicable. All citations to documents contained in the TTABVUE database are to the downloadable .pdf versions of the documents in the USPTO TTABVUE Case Viewer.

2013, and the corresponding logo since 2017."[3] Petitioner further alleges that it "has been damaged and will continue to be damaged if the PERMITS.COM Mark is permitted to remain on the [Supplemental] Register because the PERMITS.COM Mark stands as a bar to Petitioner's ability to federally register and protect its PERMIT.COM Marks in relation to Petitioner's Services."[4]

Respondent denied the salient allegations of the petition to cancel.[5]

The cancellation proceeding has been fully briefed by the parties.[6]

For the reasons explained below, we grant the petition for cancellation.

## I.   Record

The record includes the pleadings and, pursuant to Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1), Respondent's registration file.

### A.   The Parties' Evidentiary Submissions

During its main trial period, Petitioner filed numerous evidentiary materials, including:[7]

---

[3] 12 TTABVUE 3 (Amended Petition to Cancel ¶ 2).

[4] 12 TTABVUE 3 (Amended Petition to Cancel ¶ 7).

[5] 22 TTABVUE (Amended Answer).

[6] 43 TTABVUE (Petitioner's main brief); 46 TTABVUE (Respondent's brief); and 47 TTABVUE (Petitioner's rebuttal brief).

[7] Petitioner filed duplicative copies of declarations, deposition transcripts and exhibits throughout its testimony period, culminating in a total of over 3,600 pages of materials. We note Petitioner's explanation for refiling was due to "technical difficulties with exhibits" or issues with a "file size capable of upload." 43 TTABVUE 7-8 (Notes 1-5). TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 110.04 (2023) advises "ESTTA [electronic filing] users are encouraged to contact the Board when ESTTA is not working as expected" and "Filers may call the Board with questions about filing …." Also, TBMP § 110.02(c) is clear, "The size limit for each file attached is 6 MB, and the aggregate of all

- Testimonial Deposition of Scott Wilson, of Quorum Architects, Inc., with accompanying exhibits.[8]

- Testimonial Deposition of David Corson, owner of Commercial Construction Renovation, a magazine, with accompanying exhibit.[9]

- Notice of Reliance on website screenshots, including from Petitioner's and Respondent's websites; Respondent's responses to interrogatories and requests for admission; and copies of third-party registrations containing the terms PERMIT and .COM.[10]

- Testimonial Depositions, with exhibits, of: Vaun J. Podlogar (Petitioner's principal), Kent Moon (Lakeview Construction employee), Bryan Brewster (architect), Billie Jo White (Petitioner's employee), and Heather Gordon (Petitioner's employee).[11]

- Testimonial Declarations (executed June 2021, except as footnoted below) of witnesses: Vaun J. Podlogar, Kevin Nolen (Caviar and Company LLC supervisor for construction and remodeling), John Stallman (Lakeview Construction employee), Scott Wilson, David Corson and Dewayne Adamson (Pantera Global Technology Inc. owner).[12]

---

attached files for a single ESTTA transmission may not exceed 53 MB. However, because very large files degrade the performance of the Board's electronic file system, filers should limit each ESTTA submission to no more than an aggregate (all attached files combined) so as not to exceed the limitations. If a single submission, e.g., a single testimonial transcript or notice of reliance, will exceed the limitations, it should be broken into two or more submissions, in logical segments, filed consecutively." The better practice is to check Board materials for filing requirements, and contact the Board if filing difficulties arise, rather than re-submit materials until they are in the form suitable to the filer. Petitioner is advised that its duplicate submissions have hindered our efficient review of the record.

[8] 27 TTABVUE 1-35.

[9] 27 TTABVUE 36-94.

[10] 28 TTABVUE.

[11] 29-30 TTABVUE.

[12] 29 TTABVUE 5-14, 255-256; 30 TTABVUE 61-70. The declaration of Vaun Podlogar contains the statement "Executed on this 20th Day of January," without a year provided. 30 TTABVUE 256. However, Respondent accepts that this declaration was executed in 2021 in its statement of objections thereto. See 46 TTABVUE 44.

- Testimonial Declarations (executed January 2022) of Billie Jo White and Heather Gordon;[13]

- Testimonial Declarations (executed February 2023) of witnesses: Kevin Nolen, John Stallman, and Dewayne Adamson;[14]

- Printouts from the USPTO's Trademark Status & Document Retrieval ("TSDR") electronic database for the files of Petitioner's pleaded applications, Ser. Nos. 90106888 (word mark) and 90106895 (word and design mark).[15]

- Affidavit of Christopher Butler, Office Manager at the Internet Archive, with exhibits.[16]

Respondent, during its trial period, submitted the following:

- Notice of Reliance on Internet printouts regarding terms used in connection with the parties' services, including definitions of the word "permit."[17]

- Second Notice of Reliance on Internet printouts "for the purpose of showing use of the term or designation 'permit' by third parties in a generic manner to identify the type or category of services being rendered by Petitioner under its alleged 'permit' mark."[18]

- Third Notice of Reliance on Internet printouts "for the purpose of showing common and widespread use of the term 'permit' by third parties in their domain name to identify or classify the services offered by each third party as well as Petitioner."[19]

- Fourth Notice of Reliance on "copies of official records from the USPTO's Trademark Status and Document Retrieval application for the purpose of showing widespread registration and use of the term 'permit' by third parties

---

[13] 29 TTABVUE 287-290.

[14] 29 TTABVUE 281-28.

[15] 30 TTABVUE 381-432 (Podlogar Dec. Exs. 2-3).

[16] 29 TTABVUE 15-106; 30 TTABVUE 637-681, 1136-1159.

[17] 35 TTABVUE.

[18] 35 TTABVUE.

[19] 35 TTABVUE.

in their trademark registrations to identify or classify the services rendered by Petitioner."[20]

- Fifth Notice of Reliance on "screen captures from Petitioner's online presence and social media for the purpose of showing that Petitioner refers to itself as 'State Permits, Inc.' or 'State Permits' as its primary identity and trademark and uses 'permit.com' as a domain name."[21]

- Sixth Notice of Reliance on "archived versions of Petitioner's website" to show prior use of its PERMIT.COM marks;[22]

- Testimonial Declaration (executed on June 5, 2023) of Ray Antonino, Respondent's founder and CEO, with exhibits.[23]

In rebuttal, Petitioner submitted a Testimonial Declaration (executed on July 20, 2023) of Mr. Podlogar.[24]

### B. Petitioner's Evidentiary Objections

Petitioner, in an appendix to its trial brief, makes the following objections to some of the aforementioned testimony and materials submitted by Respondent:[25]

- Exhibits 1-7 of Respondent's Sixth Notice of Reliance on the basis that these materials are from the Internet Archive's Wayback Machine, and lack a foundational and authenticating affidavit;

- Exhibits A, B, C, D, F, G, I, J, K, L, M and N and associated text from the Testimonial Declaration of Respondent's witness, Mr. Antonino, on the basis that Respondent failed to produce any of these referenced documents as part of its Initial Disclosures or in response to discovery; and

---

[20] 35 TTABVUE.

[21] 35 TTABVUE.

[22] 35 TTABVUE.

[23] 36 TTABVUE.

[24] 39 TTABVUE.

[25] 43 TTABVUE 54-56.

- Antonino Dec. ¶¶ 4-11, 17, 19-24, 27, "and related exhibits" on the basis that the testimony and exhibits are "irrelevant to the issues presented in this proceeding."[26]

In response, Respondent states that it "submits its Wayback Machine evidence via notice of reliance for what it shows on its face."[27] As to the objections to the Antonino exhibits and testimony, Respondent correctly notes that "Petitioner does not identify how Respondent failed to produce documents in discovery and Petitioner did not include Petitioner's Request for Production of Documents or Respondent's responses in the record under its Notice of Reliance."[28] With respect to Petitioner's objection to testimony and materials based on lack of relevance, Respondent counters that "Petitioner fails to explain why the objected to evidence would be irrelevant."[29]

Respondent's responses to Petitioner's objections are well-taken. That is, Respondent, at the very least, may rely on the Wayback Machine screenshots for what they show on their face. As the Board explained in *Spiritline Cruises LLC v. Tour Management Servs. Inc.*, 2020 USPQ2d 48324, at *2 (TTAB 2020), "we consider Internet printouts and other materials properly introduced under a notice of reliance without supporting testimony only for what they show on their face rather than for the truth of the matters asserted therein." With respect to certain archived Internet evidence from the Wayback Machine, the Board further held that "Wayback Machine

---

[26] 43 TTABVUE 56.

[27] 46 TTABVUE 46.

[28] *Id.*

[29] 46 TTABVUE 46.

printouts, like other Internet webpages that display a URL and date, generally can be admissible under a notice of reliance as self-authenticating Internet evidence," but if such evidence was "supported solely with a notice of reliance, such Internet evidence would be admissible only for what it shows on its face." *Id.* at *3 (citing *WeaponX Perf. Prods., Ltd. v. Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1040 (TTAB 2018)).

As regards Respondent's asserted failure to provide certain discovery responses, Fed. R. Civ. P. 37(c)(1) provides, in relevant part, that "[i]f a party fails to provide information [in response to a properly propounded discovery request] ... as required by Rule ... 26(e), the party is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *See also* TBMP § 527.01(e) ("estoppel sanction"). However, the Board must have the relevant discovery requests and responses to allow it to determine if there was a failure to provide information or materials that warrants the requested sanction. Here, because the subject discovery requests and responses are not of record, Petitioner's objection in this regard necessarily fails.

Finally, as to Petitioner's objection to certain evidence based on its purported lack of relevance, we overrule this objection because Petitioner does not explain how the evidence is irrelevant. We will not fill in the void for Petitioner. *See* Fed. R. Evid. 103(a)(1)(B) (objections generally must "state[ ] the specific ground"). Moreover, as decisions of the Board often point out, Board proceedings are heard by Administrative Trademark Judges, not lay jurors who might easily be misled, confused, or prejudiced

by irrelevant evidence. *Cf. Harris v. Rivera*, 454 U.S. 339, 346 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions."). In other words, "the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence, including any inherent limitations," and keeping in mind "the various objections raised by the parties" in determining the probative value of objected-to testimony and evidence. *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1479 (TTAB 2017). Therefore, while we do not strike the objected-to evidence, we also accord it only whatever probative value is appropriate. *Id.*

In sum, none of Petitioner's objections are sustained and we do not strike any of the objected-to testimony or materials.

### C.  Respondent's Evidentiary Objections

Respondent filed a "Statement of Evidentiary Objections" with its trial brief wherein it sets forth objections to the following materials and testimony:[30]

- All testimonial declarations of individual witnesses dated prior to Petitioner's trial period, on the basis that they were executed outside of the trial period and thus are untimely, and that they are also irrelevant;[31]

- Two affidavits of Christopher Butler, an Office Manager for Internet Archive (provider of Wayback Machine website service) on the bases that they were executed outside Petitioner's trial period and Mr. Butler was never disclosed in Petitioner's initial disclosures or pretrial disclosures;

---

[30] 46 TTABVUE 43-46.

[31] Specifically, Respondent objects to the declarations of Nolen, Stallman, Wilson, Corson, Adamson, Podlogar, White, Gordon and the letter from Kay signed under penalty of perjury, that were all executed before Petitioner's trial period opened on January 21, 2023. The objected-to declarations were submitted by Petitioner multiple times. See Note 7.

- Testimony of Vaun Podlogar to the extent that he testifies regarding the Wayback Machine and previous content of the permit.com website, on the basis of lack of personal knowledge of the subject;

- A "call log" submitted as an exhibit to the Heather Gordon and Billie Jo White depositions on the basis of hearsay and lack of authentication; and

- "Additional portions of the trial testimony are objected to as violating Fed. R. Evid. 701, … Petitioner's testimonial depositions include opinion testimony that improperly states a legal conclusion in violation of Rule 701."[32]

With respect to Respondent's hearsay and authentication objections to the "call log," we do not exclude the objected-to evidence, but we will address, where necessary, any deficiencies in the evidence. The same goes for any objections based on the lack of relevance of the testimonial declarations. That is, as discussed in the context of Petitioner's objections, to the extent we rely on any of the objected-to evidence in reaching our decision, we weigh whatever probative value that evidence may have with Respondent's objections in mind. *See U.S. Olympic Comm. v. Tempting Brands Neth. B.V.*, 2021 USPQ2d 164, at *2 (TTAB 2021).

With respect to the Butler affidavit and the declarations that were executed prior to Petitioner's testimony period, Trademark Rule 2.121(a), 37 C.F.R. § 2.121(a), provides, in relevant part:

> The Trademark Trial and Appeal Board will issue a trial order setting a deadline for each party's required pretrial disclosures and assigning to each party its time for taking testimony and presenting evidence ("testimony period"). No testimony shall be taken or evidence presented except during the times assigned, unless by stipulation of the parties approved by the Board, or upon motion granted by the Board, or by order of the Board.

---

[32] 46 TTABVUE 45.

The last phrase in the rule, "… or by order of the Board" specifically gives the Board latitude to allow testimony, despite it being taken outside the submitting party's testimony period. As explained more below, the circumstances of this proceeding and actions of the parties, give rise to us exercising our discretion in overruling Respondent's objection and allowing the introduction of the objected-to affidavit and declarations.

Petitioner's trial period opened on January 21, 2023, and closed February 20, 2023. There is no dispute that the objected-to declarations were executed prior to the opening of Petitioner's trial period.

As to the untimely Wilson, Corson, Podlogar, Gordon and White declarations, Petitioner submitted the timely deposition testimony of these declarants wherein each discussed and reaffirmed their respective declaration testimony; each deponent introduced a copy of the objected-to declaration as an exhibit to their deposition.[33] Respondent's counsel did not object to their introduction. We find the testimony of the declarants attests to the accuracy of the information contained in their declarations. Essentially, each declarant incorporated their prior testimony, provided via declaration, into their deposition testimony. Accordingly, timeliness in not an issue with these declarations and Respondent's objection on this basis is overruled.

---

[33] 27 TTABVUE (Wilson Dep. Ex. 1 and Corson Dep. Ex. 1). 30 TTABVUE (Podlogar Dep. 129:9-130:3, Ex. 6; White Dep. 12:10-23, Ex. 7; and Gordon Dep. 15:14-16:5, Ex. 7).

As to the objected-to Nolen, Stallman, Adamson, and Kay declarations, Petitioner submitted copies on multiple occasions, including as exhibits with Mr. Podlogar's deposition.[34] Petitioner made clear in its submissions that it intended to rely on them as trial testimony.[35] Respondent's counsel did not object to their introduction during Petitioner's direct or Respondent's cross-examination of Mr. Podlogar.[36] Indeed, as to the Kay letter/declaration, Respondent's counsel cross-examined Mr. Podlogar regarding the import or substance of the letter.[37] Rather, Respondent waited until it filed its brief to raise its objection, instead of raising it promptly after the declarations were introduced during trial.

The submission of a stale declaration is a type of error that may be corrected on seasonable objection by timely re-executing and resubmitting the declaration. *See Moke Am. LLC v. Moke USA, LLC*, 2020 USPQ2d 10400 (TTAB 2020) (discussion of curable vs. noncurable objections to testimony affidavits and exhibits, waiver of objections and timeliness of objections), *reversed on other grounds*, 671 F. Supp. 3d

---

[34] 29 TTABVUE 5-14 (copies of Nolan, Stallman, and Adamson declarations). 30 TTABVUE 204; Podlogar Dep. 37:4-11 (testimony introducing the declarations) and 30 TTABVUE 371-380 (copies of declarations marked as Podlogar Dep. Ex. 1). 30 TTABVUE 1594; Podlogar Dep. Ex. 8 (copy of Kay letter/ declaration).

[35] 29 TTABVUE 2-4 identifying the declarations as being introduced pursuant to Rule 2.123 (involving trial testimony in inter partes proceedings).

[36] 30 TTABVUE 204 (Podlogar Dep. 37:4-11); 30 TTABVUE 371-380 marked as Podlogar Dep. Ex. "1" and "B1-B5" are the declarations of Nolan, Stallman, Wilson, Corson, and Adamson.

As to the objected-to Kay letter/ declaration (30 TTABVUE 1594; Podlogar Dep. Ex. 8), this was signed under penalty of perjury prior to Petitioner's trial period as well; however, again, Respondent's counsel did not object based on timeliness or its introduction but cross-examined Mr. Podlogar regarding the import of the letter (Podlogar Dep. 156:4-14).

[37] 30 TTABVUE Podlogar Dep. 156:4-14

670 (E.D. Va. May 3, 2023). In *Moke*, the Board found that an objection to the admissibility of sales records was waived because the objection was not raised promptly after those documents were introduced via a declaration. *See also Int'l Dairy Foods Ass'n v. Interprofession du Gruyère*, 2020 USPQ2d 10892, at *3 n.12 (TTAB 2020), *aff'd, Interprofession du Gruyère v. U.S. Dairy Exp. Council*, 575 F. Supp. 3d 627 (E.D. Va. 2021), *aff'd, Interprofession du Gruyère v. U.S. Dairy Exp. Council*, 61 F.4th 407 (4th Cir. 2023). In *Gruyère*, the Board considered declarations dated prior to trial to have been properly submitted because, although numerous substantive objections were raised, none were related to the untimeliness of the declarations. However, the Board may sustain an objection, even if first raised on brief, to stale testimony under circumstances not present here. *See, e.g.*, *Spotify AB v. U.S. Software Inc.*, 2022 USPQ2d 37, at *5 (TTAB 2022) (objection sustained because declaration was executed over one year prior to trial).

Here, had Respondent promptly objected to the introduction of the Nolen, Stallman, Adamson, and Kay declarations, Petitioner would have had the opportunity to cure the deficiency by having the declarations re-executed and resubmitted during the trial period. Respondent had ample opportunity to object to these declarations when they were being introduced via testimonial depositions or promptly thereafter. Because it did not and given the additional particular circumstances, Respondent waived or forfeited that objection and the Nolen, Stallman, Adamson, and Kay declarations are of record. *Cf. Of Counsel Inc. v. Strictly of Counsel Chartered*, 21 USPQ2d 1555, 1556 n.2 (TTAB 1991) ("[A]pplicant waived

its objection to the premature taking of the trial deposition, which could have been corrected upon seasonable objection").

As to the first affidavit of Christopher Butler, Office Manager at the Internet Archive, Respondent did timely raise an objection to its introduction because it was executed on January 18, 2023, three days prior to the opening of Petitioner's trial period.[38] Specifically, during the testimony of Mr. Podlogar, Respondent's counsel "object[ed] on the ground that it's untimely because it was taken prior to the opening of [P]etitioner's trial period."[39] In response, Petitioner asserts that it "has no control over when an affidavit is created by the Internet Archive" and that "[a]ll a party can do is make a timely request, pay the fee, and wait for the Internet Archive to produce the authenticated evidence and affidavit."[40] There is no information of record to contradict Petitioner's explanation regarding the procedure for obtaining such an affidavit from the Internet Archive, and Mr. Butler's first affidavit was merely three days "stale." Accordingly, based on these particular facts, we exercise our authority

---

[38] A second affidavit from Mr. Butler was executed on February 1, 2023, within Petitioner's trial period.

[39] 30 TTABVUE; Podlogar Dep. 71:25-72:2. Respondent also objected to the introduction of this affidavit, as well as the second Butler affidavit, on the basis that Mr. Butler was not previously identified as a witness in its pretrial disclosures. However, the Board previously informed the parties that Wayback Machine evidence may be introduced through the supporting affidavit from an employee at the Internet Archive. 21 TTABVUE 13, n. 9. In addition, Petitioner's contention that it merely makes the request from the Internet Archive and that it "could not know the name of the 'custodian' who would execute the affidavit" is plausible. 47 TTABVUE 5-6, n. 3. Accordingly, Respondent cannot claim surprise or that it was unfairly prejudiced by the introduction of the Butler affidavits, and its objection on this basis is also overruled.

[40] 47 TTABVUE 5-6, note 3.

to allow the first affidavit. *Cf. Spotify AB*, 2022 USPQ2d 37 (declaration executed over one year prior to trial excluded).

Thus, in order to remove any uncertainty, offering parties should adhere to Trademark Rule 2.121 and submit testimony taken (and for declarations, executed) within the assigned trial periods. Non-offering parties encountering stale or untimely evidence should promptly object and not wait to raise an objection on the ground of untimeliness for the first time with a trial brief.

As to Respondent's objections to the probative value and substance of Mr. Butler's testimony and the Wayback Machine evidence, the Board has observed before, "[t]he Internet Archive includes 'a service known as the Wayback Machine,' allowing users to 'surf more than 450 billion pages stored in the Internet Archive's web archive' that have been 'compiled using software programs known as crawlers, which surf the Web and automatically store copies of web files, preserving these files as they exist at the point of time of capture." *Spiritline Cruises*, 2020 USPQ2d 48324, at *3. Mr. Butler was able to authenticate the printouts attached to his affidavits showing use of PERMIT.COM on iterations of Petitioner's website from previous years and laid the proper foundation "to support that intended evidentiary use." *Id.* at *4 & n.33 (providing explanation of rationale for allowing evidence when accompanied by appropriate testimony).

In sum, none of Respondent's objections are sustained, and we do not strike any of the objected-to testimony or materials.

## II.    Petitioner's Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action is a requirement in every inter partes case. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at \*3 (Fed. Cir. 2020) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014)). A party in the position of plaintiff may seek to cancel a registration of a mark when doing so is within the zone of interests protected by the statute and it has a reasonable belief in damage that would be proximately caused by continued registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at \*6-7 (Fed. Cir. 2020) (holding that the test in *Lexmark* is met by demonstrating a real interest in opposing or cancelling a registration of a mark, which satisfies the zone-of-interests requirement, and a reasonable belief in damage by the registration of a mark, which demonstrates damage proximately caused by registration of the mark).

Petitioner has shown that it is entitled to seek cancellation of Respondent's registration on the ground of likelihood of confusion primarily through the testimony of Vaun Podlogar and supporting evidence. Specifically, the record demonstrates that the parties are both "permit expediters" and thus competitors, and Petitioner alleges use of a mark similar to Respondent's.[41] *NT-MDT LLC v. Kozodaeva*, 2021 USPQ2d

---

[41] Respondent describes itself as a "permit expediter" (28 TTABVUE, Ex. 19) and its services as "a web-based application that would allow access to local construction permitting information, requirements and the ability to pull a construction related permit for the required municipality digitally online." 36 TTABVUE (Antonino Dec. ¶ 3). Petitioner also describes itself as a "permit expediter." (30 TTABVUE, Podlogar Dep. 74:25-75:5).

433, at \*10 (TTAB 2021) ("Petitioner has established ... that it ... is a competitor of Respondent ... [and] uses a mark with the same wording and design as the mark [in Respondent's] ... registration"; therefore showing its entitlement to seek cancellation of Respondent's mark on grounds including likelihood of confusion). Petitioner's interest is thus squarely within the zone of interests protected by statute. *Luca McDermott Catena Gift Trust v. Fructuoso-Hobbs SL*, 102 F.4th 1314, 1325 (Fed. Cir. 2024) ("the petitioner can satisfy [the zone of interests] requirement if it has a 'legitimate commercial interest' in the allegedly infringed mark."). Respondent does not contest Petitioner's entitlement to bring a cause of action.

## III.   Likelihood of Confusion

Petitioner's only ground for cancellation of Respondent's Supplemental Register registration is priority and likelihood of confusion. In this case, there is no real dispute that concurrent use of the parties' proposed marks in commerce in connection with their respective services will likely cause confusion.  Likelihood of confusion is analyzed under the factors set out in  *E. I. du Pont de Nemours and Company*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973) ("*DuPont*"). Two key considerations in any likelihood of confusion determination are the factors of the similarity of the marks and relatedness of the services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods [or services] and differences in the marks.") Here, these factors weigh heavily in favor of likelihood of confusion.

Specifically, the parties do not disagree that Petitioner's PERMIT.COM mark is virtually identical to Respondent's registered PERMITS.COM mark. The plural nature of Respondent's mark does not change this. *See Wilson v. Delaunay*, 245 F.2d 877, 114 USPQ 339, 341 (CCPA 1957) (finding no material difference between the singular and plural forms of ZOMBIE such that the marks were considered the same mark); *Weidner Publ'ns, LLC v. D&D Beauty Care Co.*, 109 USPQ2d 1347, 1355 (TTAB 2014) (Applicant's mark SHAPES is "essentially the same mark" as SHAPE).

We hereafter refer to the parties' proposed marks collectively as "PERMIT[S].COM."[42]

The involved services, although not worded the same, are legally identical. That is, Respondent's "services featuring software for digitizing paper forms and digital submissions for code compliant approvals … in the field of construction" encompass or are essentially the same as Petitioner's "obtaining … government and regulatory permits, licenses and approvals, to build subdivisions, residential and/or commercial structures for others."[43] In essence, both parties are "permit expediters" (see Note 41) and are in the field of assisting others in providing the necessary information in order to acquire governmental construction permits.

---

[42] We also include Petitioner's applied-for mark, **PERMIT.COM**, inasmuch as PERMIT[S].COM is the common wording in all marks. To the extent there is a likelihood of confusion based on this common wording, this applies equally.

[43] *See, e.g.*, Podlogar Dep. 69:25-70:8 (testifying that Petitioner provides services that are "in a nutshell" described in its applications).

Pointedly, Respondent does not argue that there is no likelihood of confusion. *See, e.g., Major League Baseball Players Ass'n v. Chisena*, 2023 USPQ2d 444, *17 (TTAB 2023) ("Applicant does not address the *DuPont* factors in his brief, apparently conceding likelihood of confusion, should Opposers prevail on priority."), *appeal docketed*, No. 23-2073 (Fed. Cir. June 26, 2023), (citing *In re Morinaga Nyugyo K.K.*, 120 USPQ2d 1738, 1740 (TTAB 2016)).

Accordingly, we find that there is a likelihood of confusion based on use of the proposed nearly identical marks in connection with the same services.

However, to prevail on its likelihood of confusion claim, petitioner must also prevail on its priority claim. *See Exec. Coach Builders, Inc. v. SPV Coach Co.*, 123 USPQ2d 1175, 1199 (TTAB 2017) (priority is "an essential element of any [likelihood of confusion] claim"). Thus, this case is essentially a dispute over priority.

## IV. Priority and the Parties' Assertions of Proprietary Rights

Petitioner and Respondent each claim to have priority based on the acquisition of proprietary rights in PERMIT[S].COM. Specifically, Petitioner argues that it "has at all times since 2013 used PERMIT.COM as a trademark and tradename (and used its PERMIT.COM Logo since at least 2017),"[44] and that the term has acquired distinctiveness as a source-identifier for Petitioner's services.

Respondent, on the other hand, asserts that "[i]n early 2018, Respondent began the process of migrating and updating the branding from its PERMIT ZONE business

---

[44] 47 TTABVUE 5.

to PERMITS.COM."[45] Respondent argues that PERMITS.COM has acquired distinctiveness because it "has achieved recognition among consumers as identifying Respondent's unique software services."[46]

Because this proceeding involves a Supplemental Register registration and dueling claims of acquired distinctiveness, the issue of determining priority between confusingly similar marks is somewhat unusual. The Board explained the dynamics in a 2017 non-precedential decision involving very similar circumstances:

> Practically speaking, a registration of a merely descriptive term on the Supplemental Register, owned by a user that has not acquired distinctiveness in the term, will impede another party that *has* acquired distinctiveness in a similar descriptive term from obtaining registration on the Principal Register. The obstacle need not be perpetual, because the party that can demonstrate acquired distinctiveness would have grounds to cancel the registration on the Supplemental Register, thereby clearing the way for its own efforts to obtain registration on the Principal Register. However, the guidance of the Federal Circuit in *Books on Tape*, which we accept, is that such party need not wait until it has acquired distinctiveness in its mark before seeking to clear away the impediment.

*Theatrical Stage Emps. Union Local No. 2 v. Eaves*, 2017 TTAB LEXIS 54, at *13 (TTAB 2017) (not precedential), referring to *Books on Tape, Inc. v. Booktape Corp.*, 836 F.2d 519, 5 USPQ2d 1301 (Fed. Cir. 1987).

Here, because both parties assert proprietary rights based on their respective claims of acquired distinctiveness, we must address each claim because, should either party successfully demonstrate it first acquired distinctiveness, it would prevail on the question of prior trademark rights.

---

[45] 46 TTABVUE 36.

[46] 46 TTABVUE 41.

On the other hand, as contemplated in the Federal Circuit's *Books on Tape* decision, if Respondent has not demonstrated that PERMITS.COM has acquired distinctiveness, Petitioner need only prove that it is the prior user of PERMIT.COM to prevail on its likelihood of confusion claim.

## A. Highly Descriptive Nature of Word PERMIT[S] with the TLD .COM; Proving Acquired Distinctiveness

To establish that a term has acquired distinctiveness, the party must show that in the minds of the public, the primary significance of the term is to identify the source of the service rather than the service itself. *See In re Sausser Summers, PC*, 2021 USPQ2d 618, at *6 (TTAB 2021); *In re Guaranteed Rate, Inc.*, 2020 USPQ2d 10869, at *2 (TTAB 2020). *Accord USPTO v. Booking.com B.V.*, 591 U.S. __, 140 S. Ct. 2298, 2020 USPQ2d 10729, at *3 (2020) ("descriptive terms must achieve significance 'in the minds of the public' as identifying the applicant's goods or services--a quality called 'acquired distinctiveness' ….") (citation omitted). Each party making such a claim bears the ultimate burden of demonstrating acquired distinctiveness of its proposed mark by a preponderance of evidence. *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1005-06 (Fed. Cir. 1988).

In order to determine whether either party has acquired proprietary rights in the term PERMIT[S].COM in connection with the involved services, we first determine the nature of that term within the spectrum of distinctiveness (spanning from coined and fanciful terms to arbitrary to suggestive, and then along a descriptiveness continuum from merely descriptive to highly descriptive to generic terms).

*Booking.com*, 2020 USPQ2d 10729, at \*3; *see also Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 189 USPQ 759, 764 (2d Cir. 1976) (discussing spectrum of distinctiveness of marks). "A term is merely descriptive if it immediately conveys knowledge of a quality, feature, function, or characteristic of the goods or services with which it is used." *In re Chamber of Com. of the U.S.*, 675 F.3d 1297, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012) (citations omitted). At the far end of the spectrum, a generic term is "the name of a class of products or services," which can never be distinctive and is ineligible for registration. *Booking.com*, 2020 USPQ2d 10729, at \*2.

"Where a mark sits on a sliding scale of descriptiveness impacts the burden a proposed registrant must bear with respect to its claim of acquired distinctiveness." *Royal Crown Cola Co. v. Coca-Cola Co.*, 892 F.3d 1358, 127 USPQ2d 1041, 1045 (Fed. Cir. 2018). "In assessing acquired distinctiveness, accordingly, the Board must first determine whether the proposed mark is highly descriptive… ." *Id.*; *Spiritline Cruises,* 2020 USPQ2d 48324, at \*5 (the degree of descriptiveness "is helpful in laying a foundation for our discussion of acquired distinctiveness."). "[T]he greater the degree of descriptiveness the term has, the heavier the burden to prove it has attained secondary meaning [and acquired distinctiveness]." *In re Bongrain Int'l (Am.) Corp.*, 894 F.2d 1316, 13 USPQ2d 1727 (Fed. Cir. 1990) (quoting *Yamaha Int'l Corp.*, 6 USPQ2d 1008).

In making a determination as to whether a proposed mark has acquired distinctiveness, the Board generally looks to six factors: (1) association of the mark with a particular source by actual purchasers (typically measured by customer

surveys); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage of the product embodying the mark. *Converse, Inc. v. ITC*, 909 F.3d 1110, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018). "[N]o single factor is determinative. The amount and character of evidence required to establish acquired distinctiveness depends on the facts of each case and particularly on the nature of the mark sought to be registered." *In re Tires, Tires, Tires Inc.*, 94 USPQ2d 1153, 1157 (TTAB 2009); *accord Yamaha*, 6 USPQ2d at 1010 ("[A]bsence of consumer surveys need not preclude a finding of acquired distinctiveness. To prove distinctiveness under 15 U.S.C. § 1052(f), applicants may submit any appropriate evidence tending to show that the mark distinguishes [applicant's] goods.") (cleaned up).

In their trial briefs, Petitioner and Respondent acknowledge that the word PERMIT[S] combined with the top-level domain (TLD) .COM constitutes, at the very least, a descriptive and non-inherently distinctive term in connection with their services.[47] Indeed, Respondent conceded as much because its registration is on the Supplemental Register and this, in itself, is an admission that, as of the date of registration, PERMITS.COM was merely descriptive rather than inherently distinctive for the identified services. *In re Future Ads LLC*, 103 USPQ2d 1571, 1574 (TTAB 2012) (registration on the Supplemental Register constitutes an admission

---

[47] 43 TTABVUE 41 (Petitioner asserts that "PERMIT.COM is at least Descriptive"). Similarly, Respondent, asserts that "the parties' respective marks are, at best, highly descriptive." 46 TTABVUE 17.

that the mark is descriptive at the time of registration).[48] Petitioner, by seeking to register its marks with a claim of acquired distinctiveness of PERMIT.COM, also concedes that this term is not inherently distinctive. *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 92 USPQ2d 1626, 1629 (Fed. Cir. 2009) ("Where an applicant seeks registration on the basis of Section 2(f), the mark's descriptiveness is a nonissue; an applicant's reliance on Section 2(f) during prosecution presumes that the mark is descriptive."); *Yamaha*, 6 USPQ2d at 1005 ("Where, as here, an applicant seeks a registration based on acquired distinctiveness under Section 2(f), the statute accepts a lack of inherent distinctiveness as an established fact.")

We find that PERMIT[S].COM is, at best, highly descriptive of the parties' services.[49] Petitioner's services specifically include "obtaining … government and regulatory permits … for others." Likewise, although Respondent does not use the word "permit" in its identification, its services described in the registration include "submissions for code compliant approvals and for providing information on code compliance, namely, code research, municipal planning requirements and zoning ordinances in the field of construction." As the record makes abundantly clear, what Respondent means by a "code compliant approval" in the field of construction is

---

[48] "Registration of a mark on the supplemental register [however] shall not constitute an admission that the mark has not acquired distinctiveness." Trademark Act Section 27, 15 U.S.C. § 1095).

[49] Because genericness is not a pleaded ground for cancellation and because neither party has established that its use of PERMIT[S].COM has acquired distinctiveness as a source-identifier, we need not determine whether said term is generic.

essentially a construction permit.[50] The parties are referred to, and refer to themselves, as "permit expediters."[51] Thus, the term PERMIT, in each mark, describes the most important characteristic or end goal of the identified services, namely, assisting others in obtaining construction permits.

The addition of .COM in to the term PERMIT[S], by itself, does not make the marks distinctive; rather, it is a non-source-identifying generic top-level domain (gTLD) that merely indicates an Internet address for use by a commercial, for-profit organization. *See, e.g., In re 1800Mattress.com IP LLC*, 586 F.3d 1359, 92 USPQ2d 1682, 1685 (Fed. Cir. 2009); *In re Hotels.com, L.P.*, 573 F.3d 1300, 1304, 91 USPQ2d 1532, 1533, 1535 (Fed. Cir. 2009); *In re Oppedahl & Larsen LLP*, 373 F.3d 1171, 71 USPQ2d 1370, 1373-74 (Fed. Cir. 2004).

In sum, because we find PERMIT[S].COM highly descriptive of the parties' services, the commensurate burden of proving that it has acquired distinctiveness for either party is heavy.

## B. Petitioner's Use of PERMIT.COM and Evidence of Acquired Distinctiveness

Petitioner has submitted various materials, including deposition testimony and testimonial declarations, in support of its claim that PERMIT.COM has become

---

[50] Respondent's principal, Mr. Antonino, describes the services as "access to local construction permitting information, requirements and the ability to pull a construction related permit for the required municipality digitally online." 36 TTABVUE 3 (Antonino Dec. ¶ 3).

[51] *See supra*, n. 41.

distinctive as a source-identifier for its services. We have reviewed the evidence in its totality but remain unconvinced.

Petitioner began using PERMIT.COM at least as early as 2013 in a manner consistent with service mark use. The Wayback Machine evidence shows that Petitioner's website in 2013 appeared as follows:[52]

---

[52] 30 TTABVUE 640; Ex. 4 (Affidavit of C. Butler, Office Manager at The Internet Archive). Arrows in excerpt are provided for ease of reference.



Petitioner's owner, Vaun Podlogar, corroborated this 2013 website evidence by testifying that, based on his recollection, the above screenshot is "an accurate representation" of Petitioner's website at that time.[53]

---

[53] 30 TTABVUE 240; Podlogar Dep. 73:17-20 ("Q. And is this an accurate representation, if you recall, of what the website that you maintained at or about this time would've looked to a viewer? A. Yes.").

One year later, in 2014, Petitioner's website appeared, in part, as follows:[54]



In the text of the above website excerpt, Petitioner refers to itself as "Permit.com (State Permits, Inc.)" and touts "Permit.com has the experience and a long history of successful project completions …".

Mr. Podlogar further testified regarding Petitioner's continuous use of PERMIT.COM as a trade name and in a manner consistent with that of a service mark since 2013. Petitioner has enjoyed success within the industry, with Mr. Podlogar estimating that, since 2013, Petitioner's "total revenues reaching" 49 million U.S. dollars,[55] and approximately "70 – 70-some thousand" permits have been secured for customers.[56] As to Petitioner's market share, Petitioner points to Mr. Podlogar's testimony where he states that he believed that, at least in 2010, Petitioner was one of "three pretty major players" in the permit-expediting industry.[57]

---

[54] 30 TTABVUE 644; (Ex. 4 to Affidavit of C. Butler).

[55] 30 TTABVUE 297; Podlogar Dep. 130:18-19.

[56] 30 TTABVUE 200; Podlogar Dep. 33:9-11.

[57] 30 TTABVUE 200; Podlogar Dep. 33:20-24.

In terms of promotion, Petitioner relies on Mr. Podlogar's testimony that Petitioner promotes its services at tradeshows and conventions and, since 2013, he estimates that Petitioner has "probably" spent over $500,000 to $750,000, including placing the PERMIT.COM proposed mark on "promotional giveaways" as well as the price of attendance for such shows.[58]

Petitioner further argues that although it "did not submit a survey," it submitted the "disinterested third-party witness testimony and declarations from actual consumers and construction industry participants" and that such testimony constitutes "direct evidence of acquired distinctiveness/secondary meaning."[59] These depositions and declarations contain testimony from the following individuals: Bryan Brewster, executive director of architecture for a national chain of retail stores; Ken Moon, owner of a construction company; David Corson, a trade magazine owner; Scott Wilson, an architect; Dewayne Adamson, owner of company in retail construction industry; John Stallman, employee in the building and construction industry; and Kevin Nolen, employee of a company supervising the construction and remodeling of its locations. In general, these individuals can be characterized as having significant experience and knowledge within the construction industry and, in particular, with obtaining construction permits and permit expediter services.

Upon review of the entirety of the record, we find that Petitioner has not met its difficult burden of proving by a preponderance of the evidence that the highly

[58] 30 TTABVUE 194-195; Podlogar Dep. 27:2-28:14.

[59] 43 TTABVUE 49.

descriptive term PERMIT.COM has become distinctive as a source-identifier for Petitioner's services. Specifically, while not required but often helpful, Petitioner did not submit a customer survey that could have been meaningful to show that the relevant purchasing public views PERMIT.COM as a source for the services. Although Petitioner submitted declarations from individuals with experience and knowledge in the industry, the term PERMIT.COM is so highly descriptive that these declarations are insufficient to demonstrate the term has acquired distinctiveness. In addition, while Petitioner has used PERMIT.COM in connection with its services for approximately ten years, this is not an extensive period of time and, given Respondent's demonstrated use of PERMITS.COM since 2018, Petitioner's assertion of exclusivity of use is undercut. In the absence of contextual evidence, we cannot ascertain whether Petitioner's advertising and sales are extraordinary or little more than commonplace. *See, e.g., Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.,* 908 F.3d 1315, 128 USPQ2d 1686, 1691 (Fed. Cir. 2018) (contextual evidence needed "to arrive at a proper understanding of whether customers would recognize the mark"); *Mini Melts, Inc. v. Reckitt Benckiser LLC,* 118 USPQ2d 1464, 1480 (TTAB 2016) ("The probative value of [Applicant's sales revenue] is diminished by the fact that the amount is just a raw number in the vast pharmaceutical industry, providing no context showing Applicant's mark share and whether the stated amount of doses sold is significant in the industry.") Finally, there is no evidence of intentional copying or unsolicited media coverage of Petitioner's services being offered under the PERMIT.COM mark.

Although Petitioner has not proven acquired distinctiveness, Petitioner has at least established that it began using PERMIT.COM in a manner consistent with service mark use as early as 2013.

## C. Respondent's Use of PERMITS.COM and Assertion of Acquired Distinctiveness

Again, Respondent, for its part, admits that it only began using PERMITS.COM in early 2018, yet it argues that "PERMITS.COM has achieved recognition among consumers as identifying Respondent's unique software services."[60] In support of its claim of acquired distinctiveness, Respondent relies entirely on the testimonial declaration of its CEO, Mr. Antonino, with accompanying exhibits.[61] Mr. Antonino, testifies regarding Respondent's use of PERMITS.COM, and introduces the following screenshot from its website:[62]

---

[60] 46 TTABVUE 41.

[61] 36 TTABVUE.

[62] 36 TTABVUE 5-6, 57 (Antonino Dec. ¶ 12, Ex. H) (arrows in excerpt are provided for ease of reference).



In the text of the above excerpt from Respondent's website, Respondent identifies itself as "Permits.com" and touts the ability to "Get a permit online with Permits.com," immediately followed by the registration symbol "®." Respondent clarifies that it is "an online permit expediter service for residential and light commercial contractors in the construction industry."[63]

Although Mr. Antonino testifies that Respondent's business has been successful since 2018,[64] and it has spent significant sums in online advertising,[65] the record falls far short of showing that consumers have come to recognize PERMITS.COM as a

---

[63] 36 TTABVUE 57.

[64] 36 TTABVUE 8; Antonino Dec. ¶ 23 ("Since we rebranded from PERMIT ZONE to PERMITS.COM in 2018, our annual revenue has increased exponentially. Annual revenue in 2019 was nearly $160K, in 2020 just over $201K, in 2021 it tripled to over $639K and in 2022 our annual revenue exceeded $1.29 million. We estimate that for 2023, revenues will continue to grow exponentially.")

[65] 36 TTABVUE 8; Antonino Dec. ¶ 24 (Respondent "began online advertising for PERMITS.COM in 2019" and, since then, "spent nearly $200k" for advertising.)

unique source-identifier for Respondent's services. Respondent's revenue and marketing evidence lacks contextual evidence needed to gauge the importance of the numbers provided. *Mini Melts*, 118 USPQ2d 1480.

Respondent has conceded that, at least as of February 18, 2020, PERMITS.COM was merely descriptive of Respondent's services and had not acquired distinctiveness. *In re Future Ads*, 103 USPQ2d at 1574 (Supplemental Registration constitutes an admission by owner that the mark was descriptive at the time of registration). It has not been a long time from that date and, given Petitioner's use of PERMIT.COM during this period, Respondent's use of its mark has not been exclusive. Pointedly, Respondent also did not introduce any testimony from third-parties stating that they recognize PERMITS.COM as a source-identifier for Respondent's services. Indeed, as stated, the burden of proving that such a highly descriptive term has acquired distinctiveness is a particularly heavy one, and Respondent's evidence falls woefully short.

### D. Conclusion as to the Parties' Claims of Acquired Distinctiveness

In sum, Petitioner and Respondent vigorously asserted proprietary rights in the highly descriptive designation, PERMIT[S].COM, based on acquired distinctiveness, but neither party met its burden of proof. Again, had either party successfully demonstrated acquired distinctiveness, the guidance of *Books on Tape* would be inapposite because priority would have been established by the party that acquired proprietary rights first and that party would prevail in this proceeding. Instead, we are left with a scenario where neither party has demonstrated that it has acquired

proprietary rights, one party owns a Supplemental Register registration, and the other party is the prior user. Thus, the Federal Circuit's decision in *Books on Tape* applies here.

## V.   *Books on Tape*: Petitioner as First to Adopt PERMIT.COM

In *Books on Tape,* the petitioner, a prior user of BOOKS ON TAPE for the sale of cassette tapes, sought to cancel a Supplemental Register registration for the mark BOOKTAPES for prerecorded audio tapes for instructional purposes, alleging likelihood of confusion. The Court noted findings that neither party had established secondary meaning, or acquired distinctiveness, for their respective terms, but found that petitioner, as the prior user, was entitled to maintain the cancellation proceeding.[66]

In arriving at its decision in *Books on Tape*, the Federal Circuit limited the holding of *Otto Roth & Co., Inc. v. Universal Foods Corp.*, 640 F.2d 1317, 209 USPQ 40, 43 (CCPA 1981), that a plaintiff "must prove he has proprietary rights in the term he relies upon to demonstrate likelihood of confusion," to proceedings challenging registration on the Principal Register:

> [T]he ruling on the merits in *Otto Roth*, in any event, is not controlling here. The *Otto Roth* opposer sought to prevent the applicant's registration of an arbitrary mark on the *Principal* Register on the basis of prior use of a *descriptive* phrase. One who had proprietary rights in a mark was being

---

[66] The Federal Circuit also reversed a prior Board finding that petitioner's mark was generic. *Books on Tape*, 5 USPQ2d at 1302 (petitioner's BOOKS ON TAPE mark "while aptly descriptive at the time of its adoption by petitioner appears no more descriptive than the challenged mark BOOKTAPES, a term the PTO accepted for registration on the Supplemental Register").

> attacked by a party who had established no rights in a mark on the ground that the applicant's use would be attributable to opposer. In contrast, this case concerns a registration for a *descriptive* term on the *Supplemental* Register. The registrant here has as yet no proprietary rights in a mark ....
>
> The statute does not require the anomalous result that a junior user is entitled to keep its Supplemental Registration for a descriptive term in which it has not established secondary meaning (as evidenced by registration on the Supplemental Register) because a *prior* user cannot show secondary meaning in that term either.

*Books on Tape*, 5 USPQ2d at 1302.

Thus, because the *Books on Tape* petitioner was first to adopt the confusingly similar term, albeit a descriptive one, and neither party had established proprietary rights, the respondent, as a junior user, was no longer entitled to its registration on the Supplemental Register.

We have found that Petitioner first used PERMIT.COM in 2013 and Respondent then used PERMITS.COM in 2018, five years later. In accordance with the *Books on Tape* decision, we too find it would be an "anomalous result" if, in view of our finding of a likelihood of confusion, Respondent is permitted to keep its Supplemental Register registration for PERMITS.COM, in the absence of a showing of acquired distinctiveness and in the face of Petitioner's prior use of PERMIT.COM. As in *Books on Tape*, Petitioner in this case need not establish that PERMIT.COM has acquired distinctiveness as a source identifier of its services, but need only be the prior user, for purposes of prevailing on its likelihood of confusion claim and its petition to cancel Respondent's registration on the Supplemental Register.

**Decision**: The petition to cancel is granted, and Respondent's Supplemental Register registration will be cancelled in due course.